J-S15028-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: N.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.L., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1644 WDA 2019 |

Appeal from the Order Entered October 10, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000010-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: J.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.L., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1645 WDA 2019 |

Appeal from the Order Entered October 10, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000011-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: E.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.L., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1646 WDA 2019 |

Appeal from the Order Entered October 10, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-012-2019

J-S15028-20

BEFORE:    BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                    FILED JULY 24, 2020

In this consolidated appeal,[1] Appellant, A.L., ("Mother") appeals from the October 10, 2019 orders terminating her parental rights to her dependent children, N.G., a male child born in November 2011, J.G., a male child born in April 2015, and E.L., a female child born in September 2017, (collectively, "the children"), pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[2]  We affirm.

The trial court set forth the following:

Mother has a long history of [Allegheny County Office of Children Youth and Families' ("OCYF")] intervention necessitated by her inability to provide a healthy and safe environment for her children.  The three [] children [] were born testing positive for either opiates or cocaine.  Upon notification to OCYF, services were provided to Mother to aid her with her struggle against substance abuse.  Subsequent to each birth, the services provided allowed Mother to remain in custodial care of her two [] oldest[] children[,] N.G. and J.G.  However, after the birth of E.L., upon discharge from the hospital[, E.L.] was placed in foster care where she remains until this day.

[The presumed b]iological father of N.G. and J.G. died in early 2016.  Approximately two [] weeks later[,] OCYF received reports that [N.G. and J.G.] were in danger due to Mother's ongoing drug addiction problems.  In March 2016, OCYF presented themselves

_____

[*] Former Justice specially assigned to the Superior Court.

[1] In a November 12, 2019 per curiam order, this Court consolidated the three appeals sua sponte.

[2] The October 10, 2019 orders also terminated the parental rights of the unknown father of N.G. and J.G., and terminated the parental rights of "Mike Unknown," the unknown father of E.L.

- 2 -

at Mother's home and confronted her with these concerns. Mother refused to submit to drug testing thereby requiring OCYF to obtain an [e]mergency [c]ourt [o]rder for [c]ustody. After approximately three [] months[, N.G. and J.G.] were returned to Mother under OCYF supervision. On June 10, 2016, after receiving additional reports of Mother's continued substance abuse, OCYF returned to the home to investigate these claims. Upon knocking at the door for several minutes[,] five-year-old [N.G.] opened the door, exited, followed thereafter by [J.G., who crawled] out the door. It was several minutes before Mother finally presented herself to the OCYF caseworker. Dependency petitions were filed but disposition was deferred so that services could once again be provided for Mother.

In April 2017, OCYF was contacted by the police[,] who reported that Mother was driving a motor vehicle with multiple children in the car, none of whom were properly secured. Once again, OCYF provided services including in-home services for Mother. However, these services were ultimately terminated due to Mother's lack of cooperation. Finally, on September 5, 2017, OCYF received a report from local police that they had been called to [Mother's residence] due to complaints of drug abuse. Responding police [officers] reported that Mother admitted that she relapsed into her drug use. Also, at this time, suspected cocaine was found at the residence. Based on this report, OCYF responded to the residence on September 6, 2017. The caseworker found the home and [N.G. and J.G.] to be in a deplorable state. Mother appeared to be suffering from symptoms of withdrawal[,] as well as in the late terms of pregnancy. Due to health concerns for Mother and the children, the caseworker took them to the hospital for examination. The treating physician noted that J.G. had a burn on his hand consistent with a cigarette being extinguished on his skin. Additionally, the treating physician diagnosed J.G. with [hand-foot-and-mouth disease]. When Mother was confronted with the cigarette burn to her son, she stated that she had not noticed the injury but that sometimes she leaves lit cigarette butts on the porch [that] may have caused the burn without her knowing about it.

As a result of these latest events and concerns, OCYF removed the two [] boys by way of [a s]helter [h]earing on September 14, 2017. []Mother [subsequently] gave birth to E.L., who was six [] weeks premature and tested positive for cocaine upon her birth. Thereafter[,] on September 18, 2017[,] a second [s]helter [h]earing was conducted as to E.L., [at] the conclusion of which it

was ordered that upon her discharge from the hospital she would be placed in shelter care. On September 22, 2017[,] the two [] boys were placed in their present foster home where they have remained since that date. On October 11, 2017[,] a dependency hearing was conducted at which time the boys were declared dependent. Upon discharge from the hospital on September 26, 2017, E.L. was placed in a separate foster home from the boys where she has remained to this date. On October 11, 2017[,] she was also declared to be a dependent child. As a result of the dependency adjudication[s], OCYF prepared a [f]amily [s]ervice [p]lan to address the issues and concerns that necessitated the removal of Mother's children. This plan included[] goals of drug and alcohol treatment, contact with her children, cooperation with OCYF, maintaining housing stability, and addressing mental health concerns.

Addressing the drug and alcohol treatment goal, Mother was to submit to drug screens through [Allegheny] County. From 2017[,] forward, Mother was called for a total of 74 drug screens. Of those 74 requests for drug screens, Mother failed to show for 42. On those times that Mother did appear for a drug screen, [] she tested positive [7 times] for a substance other than methadone, for which she had a prescription. Prior to the termination hearing[,] Mother admitted that she[,] once again, relapsed and had been using heroin.

Mother [] maintain[ed] contact with her children through supervised visitation. However, during these visitations, Mother showed a lack of ability to properly maintain control of her children. During one of the supervised visits, J.G. [threw] a toy at Mother. In response to his actions, Mother [slapped] him across the face. As part of the ongoing assistance that OCYF was providing to Mother, there were attempts to aid Mother [with] the manner [in] which she would handle the behaviors of her children. Specifically, Mother was advised of the necessity to redirect her children when they were misbehaving. However, Mother appears not to have adopted this approach in the manner in which she disciplines her children for inappropriate behavior.

Mother was also given the goal of maintaining stable housing. However, throughout the time frame of the removal of the children to the time of the termination hearing, Mother [] failed to obtain a stable residence. Efforts were made by OCYF to aid her in finding housing, but to no avail. For each failed housing attempt, Mother found a reason for her failure to comply. Finally, Mother

admitted that at the time of the termination hearing she was[,] once again[,] living with her paramour, who she acknowledged was presently abusing heroin[.]

Trial Court Opinion, 1/2/20, at 2-5.

On January 15, 2019, OCYF filed petitions for involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5), (a)(8), and (b). Attorney Frank B. Wilson, Esq., from the Office of Conflict Counsel, was appointed to represent the legal and best interests of J.G. and E.L. Attorney Kelly Goodrich, Esq., also from the Office of Conflict Counsel, was appointed to represent the legal and best interests of N.G.[3] A termination hearing was held on October 4, 2019, at which counsel for OCYF, counsel for the children, and Mother's counsel, as well as Mother, participated.[4] On

_____

[3] We note that at the time of the involuntary termination hearing, N.G. was almost eight years old, which is a sufficient age at which he could articulate a legal interest that may conflict with his best interests. Mother, however, did not raise an issue concerning Attorney Goodrich's representation of both N.G.'s legal interests, as well as his best interests. See Mother's Brief at 10, 18-24. An en banc panel of this Court, in In re Adoption of K.M.G., 219 A.3d 662 (Pa. Super. 2019), held that we cannot raise sua sponte the issue of whether a conflict of interest existed in counsel's representation of both the child's legal interests, as well as the child's best interests. K.M.G., 219 A.3d at 669 (stating, "this Court only has the authority to raise sua sponte the trial court's failure to appoint any counsel for the [c]hild (emphasis in original)). Our Supreme Court, however, granted a petition for allowance of appeal on the issue of whether an appellate court has the authority "to review, sua sponte, whether a child's legal interest was represented by counsel during an involuntary termination of parental rights hearing." K.M.G., 221 A.3d 649 (Pa. 2019).

[4] Because the identities of the children's fathers were unknown, OCYF published notice of the termination hearing several times in the Pittsburgh

October 10, 2019, the trial court found that OCYF met its burden of proof under the aforementioned sections of the Adoption Act, and subsequently terminated Mother's parental rights to the children. This consolidated appeal followed.[5]

Mother presents the following issue for our review: "Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of []Mother's parental rights would serve the needs and welfare of the [c]hildren pursuant to 23 Pa.C.S.[A.] § 2511(b)?" Mother's Brief at 10.

_____

Legal Journal. The unknown fathers were not present or represented by counsel at the termination hearing.

[5] On November 7, 2019, Mother filed concise statements of errors complained of on appeal with her notices of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court subsequently filed its Rule 1925(a) opinion on January 2, 2020.

A review of the notices of appeal demonstrates that each notice contained the names of all three children and the corresponding docket numbers. Counsel for Mother, in filing a separate notice of appeal at each docket number, highlighted the child's name and docket number that corresponded with that filing. An en banc panel of this Court, in Commonwealth v. Johnson, J., ____ A.3d ____, 2020 WL 3869723, at *4 (Pa. Super. Filed July 9, 2020) (slip opinion), recently held that if an appellant files a separate notice of appeal at each trial court docket, "[t]he fact that the notices [of appeal] contained [more than one trial court docket number] is of no consequence." Id. at *4 (overruling, explicitly, the majority decision of a three-judge-panel in Commonwealth v. Creese, 216 A.3d 1142 (Pa. Super. 2019) (Strassburger, J. dissenting) that held a notice of appeal was permitted to contain only one docket number). We, therefore, find that Mother complied with the mandates of Commonwealth v. Walker, 185 A.3d 969 (Pa. 2018), requiring a separate notice of appeal to be filed at each trial court docket, and Pennsylvania Rule of Appellate Procedure 341.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., 9 A.3d [1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re Q.R.D., 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re B.J.Z., 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

B.J.Z., 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re Z.P., 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted).

Here, Mother appeals the trial court's determination under Section 2511(b).[6] Mother's Rule 1925(b) Statement, 11/7/19; see also Mother's Brief at 10. Therefore, Mother waives any challenges under Section 2511(a). In re L.V., 209 A.3d 399, 413 (Pa. Super. 2019) (stating, the failure to preserve an issue in a Rule 1925(b) statement and the statement of questions presented in a brief constitutes waiver of the issue).

Section 2511(b) provides as follows:

§ 2511. Grounds for involuntary termination

_____

[6] Mother concedes that OCYF satisfied its burden of proof under Section 2511(a)(2). Mother's Brief at 18-19. See In re A.S., 11 A.3d 473, 483 (Pa. Super. 2010) (holding, the record need only support one ground relative to Section 2511(a) in order to support termination of parental rights).

. . .

(b.) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). The analysis under Section 2511(b)

focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [Section] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the [trial] court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of J.N.M., 177 A.3d 937, 943-944 (Pa. Super. 2018) (original brackets omitted), quoting In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015), appeal denied, 183 A.3d 979 (Pa. 2018). A trial court may

rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. J.N.M., 177 A.3d at 944 (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)); see also In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005) (holding, a trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond" (citation omitted)). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." In re I.E.P., 87 A.3d 340, 346 (Pa. Super. 2014), quoting In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010).

Here, Mother argues that the trial court, in determining that termination of Mother's parental rights served the best interests of the children, erred by applying a fault-based analysis that referenced Mother's past behaviors and failure to address her mental health issues. Mother's Brief at 22-23. Mother contends the trial court abused its discretion when it failed to consider the emotional bonds Mother had with the children and the effect that terminating those bonds would have on the children. Id. at 23.

In terminating Mother's parental rights to the children, the trial court relied on, inter alia, the testimony of Dr. Patricia Pepe, who conducted evaluations of Mother, the children, and the children's foster parents. Trial Court Opinion, 1/2/20, at 7. The trial court stated,

The most compelling evidence that Mother is incapable of meeting the needs and welfare of her children begins with her mental health disorders. Her failure to appreciate the nature of her issues, and her refusal to seek help to address these issues, begins the long road to her multiple inabilities to provide a safe, stable, and loving environment that would allow her children to flourish.

Dr. Patricia Pepe conducted evaluations of Mother, the [] children, [and the] foster parents. Upon completion of the evaluation of N.G., Dr. Pepe recommended a pediatric neurological evaluation and a pediatric neuropsychological evaluation. After performing an evaluation of Mother in 2018, Dr. Pepe diagnosed Mother with [o]piate [u]se [d]isorder in early remission on maintenance therapy, [a]nti-[s]ocial [p]ersonality [d]isorder, and [n]arcissistic [p]ersonality [d]isorder. As part of Mother's evaluation, Dr. Pepe conducted multiple psychological tests to aid in making her diagnoses. In doing so, Mother was found to have distorted thinking[,] which may manifest through frequent mood changes, impulse control, or anger control. Mother was also found to evidence persecutory thinking. These characteristics tend to include [the] tendency to blame others, feelings of being misunderstood, and projection of conflicts onto others. Also, testing showed signs of rigidly virtuous characteristics. This is displayed by an inflated sense of self[,] as well as belief in all manners of their actions.

Dr. Pepe concluded that while Mother may initially participate in plans to further her goals, she will have an inability to maintain them. In her failure, she will have a tendency not to accept responsibility but to project the reasoning as the fault of outside forces. Dr. Pepe found this especially disturbing given Mother's long history of substance abuse. People that [] exhibited this type of psychological behavior without addressing those concerns show higher rates of relapse and dependence on substance abuse. Dr. Pepe attempted to explain her concerns to Mother in an effort to help her understand the need to engage in long[-]term mental health care. Mother's response was that she saw her own therapist[,] who disagreed with Dr. Pepe's diagnosis. Further, the statement[,] in and of itself[,] shows a lack of understanding of her illness, denial, and projection, all of which Dr. Pepe set forth as problems found with the type of psychological disorder [Mother] displays.

Dr. Pepe also had the opportunity to conduct interactional evaluations between the children and their respective foster parents. E.L. and her foster parents showed a strong bond and a positive development of this child. Not surprisingly, E.L. shows a parental bond with [her] foster parents as opposed to Mother, in that E.L. [] remained with [the] foster parents from the time of her birth. As to the boys[,] N.G. and J.G., Dr. Pepe found that their early childhood with Mother was subject to great neglect and instability due to her drug abuse. This neglect was more manifest in [N.G.,] who referenced enjoying the foster home due to the care, stability, and availability of food. Dr. Pepe found that even though N.G. might miss [Mother] to some degree upon the severance of the parental bond, [] given Mother's continued instability[,] it would be in[] his best interest to be adopted by his foster parents. Any bond that existed, if allowed to continue in the fashion as evidenced by Mother's past behavior, would not be a healthy bond, and in fact detrimental to his well-being.

Id. at 7-8.

A review of the record demonstrates that E.L., having been in the care of her foster parents since the time of birth, "acts towards [the foster parents] as one would expect any two-year[-]old [child] to act toward [his or her] parent." N.T., 10/4/19, at 26, 232. E.L. refers to her foster parents as "mom" and "dad." Id. at 27. In examining the effect that termination of Mother's parental rights would have on E.L., Dr. Pepe opined that E.L., due to her young age, would not have a good cognitive understanding of what it would mean to remove Mother from her life. Id. at 165. E.L.'s foster parents are the only family E.L. has known, and E.L. exhibits a positive and primary attachment to her foster parents. Id. at 157. Dr. Pepe explained that the impact of breaking the primary bond E.L. has with her foster parents would have a significant

psychological and neurological implication on E.L. both in the present and in the future. Id. at 157-158.

N.G. exhibited some parental bonding with Mother, as demonstrated by his acknowledgement that he would feel sad if he could not continue to see Mother. Id. at 158. N.G., however, continued to maintain that he preferred to remain with his foster parents due to the stability and security that they provided him. Id. at 155-158. N.G. described his living conditions with Mother as "very poor" and cited as an example that he was not potty trained until he was six years old. Id. at 149-150. N.G. remarked, "I know my mother didn't take care of me" and he sometimes referred to Mother by her first name rather than "mother." Id. at 125, 145. N.G.'s foster parents meet his educational, medical, developmental, and home-life needs, such as providing food. Id. at 97-98.

J.G.'s primary attachment was with his foster parents, and he did not have a traditional parental bond with Mother. Id. at 169, 172. J.G. had less familiarity with Mother than his older brother, N.G., due to his age, and he was less expressive of his feelings. Id. at 158, 165. J.G. had a greater sense of safety and security with his foster parents that was absent from his experience with Mother. Id. at 169. Dr. Pepe opined that the severance of J.G.'s parental bond with Mother would not be "excruciating" for him because he viewed Mother as someone that he visited rather than someone in the role of parent. Id.

Dr. Pepe expressed concern about Mother's current living arrangements with an individual that Mother admitted involved intimate partner violence. Id. at 159. Dr. Pepe remarked that her concern stemmed from the fact that "children who grow up in homes with domestic violence or intimate partner violence . . . have almost a 100 percent chance of being a perpetrator or victim in their future." Id. In support of the termination of Mother's parental rights, Dr. Pepe stated,

> If you look at what best interest standards are, [it is] who is capable of providing stability and nurturance. [Who is] capable of insuring that the children are being able to succeed. [Who is] capable of providing them with consistency. Continuity is very important for children.
>
> I think the issues of the previous neglect and the history of drug use [] had a toll on the children. The [Adoption Act] states that there needs to be stability and continuity in the children's education, family life, [and] community life. [W]hat the children have expressed [must also be considered]. Of course[,] [E.L. has not] expressed anything [due to her age.]
>
> It seems that the foster parents are[,] at this point[,] more likely to maintain a loving, stable, consistent, [and] nurturing relationship with the [children. The foster parents are] able to adequately meet the [children's] emotional needs. So I see them as being at a better level to provide[.]

Id. at 161-162.

Based upon a review of the record, we find competent record evidence to support the trial court's conclusion that termination of Mother's parental rights to N.G., J.G., and E.L. serves the best interests of the children. The evidence supports that a limited parent-child bond existed between Mother and each of the children and that these bonds could be severed without

J-S15028-20

causing a detrimental effect on the children.  Moreover, the record supports that the foster parents are in the best positions to satisfy the safety needs of the children by providing, inter alia, stability and security.  Therefore, we discern no abuse of discretion or error of law on the part of the trial court in concluding that termination of Mother's parental rights to each of the children is in the best interest of the child.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/24/2020

- 15 -