J-A01038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.B., MOTHER | : : : : : : : | |
| | : | No. 955 MDA 2021 |

Appeal from the Decree Entered July 8, 2021
In the Court of Common Pleas of Columbia County Juvenile Division at
No(s):  2021-OC-0000085-RT

BEFORE:  LAZARUS, J., NICHOLS, J., and KING, J.

MEMORANDUM BY LAZARUS, J.:  **FILED:  MARCH 8, 2022**

A.B. (Mother) appeals from the decree, entered in the Court of Common Pleas of Columbia County, involuntarily terminating her parental rights to her minor son, B.R. (Child) (born January 2017).[1]  After careful review, we affirm.

Child was born premature and started losing a significant amount of weight when he was three months old.[2]  On May 8, 2017, Columbia County Children and Youth (CYS) was notified that Child was failing to thrive (underweight/poor nutrition) and that Mother and Father were not taking Child to medical appointments.  Child was removed from Parents' care, pursuant to an emergency order of protective custody, and placed into foster care.

---

[1] Father's parental rights to Child were also terminated.  He is not involved in this appeal.

[2] Child was ultimately diagnosed with "failure to thrive," was considered "emaciated," and was the weight of a two-month premature baby when he was four months old.  Initial Service Plan, 5/17/17, at 2.

On May 16, 2017, Child was adjudicated dependent. CYS implemented a family service plan for Mother, with the primary goal of reunification, which included the following objectives: attain stable housing; maintain safe housing with appropriate household members; meet Child's basic needs; visit weekly with Child; complete parenting classes; participate with the family center program; and display parenting skills learned. A child permanency plan was also put into place at the same time, listing the same objectives as the service plan and designating that Mother's one-hour per week visits be supervised by an agency caseworker or foster parent and that Mother maintain a bond with Child and keep Child safe.

On March 23, 2018, Child was placed in a foster home, where he continues to reside to date with Foster Parents. On April 23, 2021, the Agency filed simultaneous goal change and termination petitions. The trial court held hearings on June 20, 2021, and July 8, 2021, at which CYS caseworker Brittany Hacker, Child's foster mother, Mother, and Father testified. After the hearings, the court granted CYS' petitions, changing the goal to adoption[3] and terminating Mother's parental rights to Child pursuant to sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[4]

On appeal, Mother raises the following issues for our consideration:

---

[3] Mother does not contest the goal change on appeal.

[4] 23 Pa.C.S.A. §§ 2101-2938.

(1)    Did the [trial] court commit an error of law and [an] abuse of discretion when it terminated the parental rights of [M]other to her minor child?

(2)    Did the [trial] court commit an error of law and [an] abuse of discretion when it determined that [CYS] presented clear and convincing evidence in support of terminating the parental rights of [M]other?

(3)    Did the [trial] court commit an error of law and [an] abuse of discretion in determining the best interest[s] of the child would be served by terminating the parental rights of [M]other?

Appellant's Brief, at 6.

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

To support her claim that the court improperly terminated her parental rights, Mother contends that, until COVID restrictions were enacted in March 2020, she "continuously attempted to comply with [CYS'] goals for reunification." Appellant's Brief, at 18. To that end, Mother asserts that she consistently attended visits with Child, maintained continuous employment, had, and now has, stable housing, completed 10 parenting classes, provided food and gifts to Child, and, "most importantly, loves [] Child." N.T. Termination Hearing, 6/30/21, at 17. Mother argues that she was not given the opportunity to attend Child's medical appointments while Child was in placement because Foster Parents did not keep her informed of any scheduled appointments. *See id.* at 45, *id.*, 7/8/21, at 5, 6 (CYS caseworker verifying

- 3 -

on cross-examination Parents not being notified of Child's scheduled doctors' appointments). Mother also contends that she and foster mother were never advised that in-person visitation was an option during COVID, and that Mother was unable to attend her virtual (Zoom) visitations due to poor internet service and lack of funds to pay for Verizon services.

We recognize that

[i]n a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under section 2511(a) exists and that termination promotes emotional needs and welfare of child as set forth in section 2511(b)).

Instantly, CYS caseworker Hacker testified that Mother last visited with Child on May 14, 2021, **see** N.T. Termination Hearing, 6/30/21, at 20, and that while "throughout the life of the case . . . Mo[ther] was consistent and had contact [with Child,]" *id.* at 21, "from January [2021] until [June 2021,

Mother] has only attended six visits out of the weekly scheduled visits." ***Id.*** Caseworker Hacker testified that many of those missed visits were scheduled remotely and that foster mother would send Mother the Zoom link, but never get a response from Mother or Mother would attempt to reschedule the visit. ***Id.*** ***See also id.*** at 47 (CYS caseworker testifying on cross-examination that visits that did not occur were all Zoom visits scheduled after March 2020). Caseworker Hacker also testified that in-person visits resumed in early May 2021 and that Mother attended a visit on May 14, 2021, but since then Mother "has either confirmed and not showed up or did not confirm for the remainder of the visits until [the termination] hearing." ***Id.*** at 23. ***See also id.***, 7/8/21, at 38 (foster mother testifying she sent Zoom link to Mother every time visit scheduled). Notably, in July 2019, Mother's visits returned[5] to supervised after CYS found Father, who was not permitted to have contact with Child, hiding in a closet at maternal grandparents' house prior to Child's visit.[6] ***Id.*** at 30-31.

---

[5] Mother's visits were originally (the first half of 2018) supervised and then changed to unsupervised in late 2018. N.T. Termination Hearing, 7/8/21, at 49. In July 2019, the visits were ordered to be supervised again and, then in January 2020, Mother was permitted to have unsupervised day visits. ***Id.*** at 8.

[6] With regard to Mother's goal to attain stable housing, Caseworker Hacker initially testified that she was only able to conduct one house check, which was to maternal grandparents' house, which she found appropriate. ***Id.*** at 45. However, the caseworker later testified on cross-examination that, one week before the termination hearings, she had checked Mother's residence and deemed it not to be appropriate. ***Id.***, 7/8/21, at 11. Caseworker Hacker
*(Footnote Continued Next Page)*

Caseworker Hacker testified that, overall, she had "sporadic" contact with Mother from August 2020 through the beginning of February 2021.[7] *Id.* at 28. At the time of the termination hearing, Mother reported that she was residing in Catawissa, although the caseworker had been unsuccessful in conducting unannounced home visits. *Id.* at 32. Mother's last reported place of employment, at the time of the hearings, was Papa Johns in Benton, although the caseworker testified that she never tried to obtain Mother's work schedule/hours or verify her employment. *Id.* at 34. *See also id.* at 46 (CYS caseworker testifying on cross-examination Mother has worked at Papa Johns for "pretty much the duration of th[e] case"); *id.*, 7/8/21, at 61 (Mother testifying she worked at Pappa Johns and Uni-Mart from September 2018 until February 2021 and, thereafter, at Auto Zone and Fresh and Quick Market). Caseworker Hacker testified that while Parents completed some parenting classes, they had not successfully completed the parenting program. *Id.* at 35. Mother was referred to the family reunification program three times, a program that works with families to complete in-home and community-based

_____

testified that it lacked hot water, and was basically "a shed turned into a one[-]bedroom apartment." *Id.* at 12. Finally, Caseworker Hacker testified that in November 2020, Mother reported that she was "currently homeless." *Id.* at 15.

[7] Caseworker Hacker testified that "[t]hroughout the life of the case" Mother has tested positive for marijuana and was told at permanency review meetings that she needed to stop smoking. *Id.* Mother tested negative in May 2021, right before the first termination hearing. However, Mother was not responsive to caseworkers, who left voicemails from June 2020 through August 2020, to come into the office for a 24-hour drug screen. *Id.*

parenting classes; each time, Mother was prematurely discharged "due to lack of contact or cooperation with the [] center." *Id.*

With regard to a parent-child bond, caseworker Hacker testified that during Mother's "sporadic" Zoom visits, bonding was encouraged. *Id.* at 37. Caseworker Hacker testified that Mother met Child's "basic needs during unsupervised [in-person] visits [when she would] take [Child to] lunch[,] walk [with him] for lunch[, and] bring him snacks and drinks." *Id.* Caseworker Hacker testified that Child's last visit with Mother "was good" and that Mother was "very interactive" with Child and that Child refers to Mother as "mom." *Id.* at 40. However, caseworker Hacker testified that, because Mother was unable to complete her service plan objectives, CYS was not able to assess Mother and, as a result, CYS could not increase the frequency of visitation. *Id.* at 37-38.

Child is thriving with his foster family,[8] who are an adoptive resource and with whom he had been living for more than three years at the time of the termination hearings. *Id.* at 38. Caseworker Hacker testified that Child and foster parents are "absolutely bonded," that they "go on family outings, family vacations, [Child] refers to foster parents' daughter as 'sissy[,']and . . . to [foster parents] as mom and dad." *Id.* at 39. Child is outwardly affectionate with his foster family, giving them hugs and telling him that he

---

[8] Foster parents have a biological daughter who was fourteen years old at the time of the June 2021 termination hearing. *Id.* at 39.

loves them. *Id.* at 39-40. Caseworker Hacker testified that Child's foster parents meet all of Child's physical, emotional and social needs, *id.* at 40, and that she believes it is in Child's best interest to be adopted, where foster parents "have been there for him," are a stable environment, and have been providing for Child for most of his life.[9] *Id.* at 41-42. Finally, Caseworker Hacker testified that she did not think that Child would be harmed if Mother's parental rights were terminated, even though he "does get along with his biological parents." *Id.* at 42.

We concur with the trial court's determination that CYS proved, by clear and convincing evidence, that termination of Mother's parental rights to Child was proper under section 2511(a)(5).[10] *See* 23 Pa.C.S.A. § 2511(a)(5) (where child has been removed from parent's care by court for at least six months, conditions which led to removal or placement of child continue to exist, and parent cannot remedy those conditions within reasonable period of time and services reasonably available to parent not likely to remedy removal conditions and termination of parental rights best serves needs and welfare of child). Child had been in placement for over 4 years at the time of the termination hearings. Mother's ability to maintain stable housing has been

---

[9] Caseworker Hacker testified that while Child has been living with foster parents, Child was successfully discharged from speech therapy. *Id.* at 42.

[10] We can affirm the trial court's decision regarding the termination of parental rights with regard to any singular subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

irregular at best, Mother's visitation was inconsistent during COVID-restricted remote visits, throughout the life of the case Mother has tested positive for marijuana, Mother has not completed community-based parenting classes, having been unsuccessfully discharged three times from parenting programs, and Mother admitted that "[t]hroughout 2020 and the beginning of [2021 she] was actually homeless quite often."[11]  N.T. Termination Hearing, 7/8/21, at 61.

Additionally, Mother has failed to remain in contact with CYS caseworkers throughout Child's placement, making it impossible for agency workers to verify suitability of housing, get details regarding her employment status, confirm her ability to participate in remote visits, follow-up with maternal grandparents as a kinship resource, and be able to administer drug screens.  Moreover, Child is in a beneficial pre-adoptive placement where he is thriving emotionally, physically, and socially and has fully bonded with his foster family.

With regard to termination under section 2511(b), Mother argues that CYS did not present clear and convincing evidence to show that termination would be in Child's best interest or the effect that permanently severing the bond with Mother would have on Child.  Mother also notes that Child knows Mother, refers to Mother as "mom," and Child did not display any negative behavioral issues during visits or phone calls with Mother.

---

[11] Mother testified that for a while during that time she and her boyfriend lived out of their car.  *Id.* at 62.

While Child may recognize Mother and even refer to her as "mom," any bond that may exist between Mother and Child is "far outweighed by Mother's inability to remedy the causes of Child's placement." **See Adoption of C.J.P.**, 114 A.3d 1046, 1055 (Pa. Super. 2015). As the trial judge astutely noted, Child needs permanency and stability in his life; four years in placement is too long to wait for Mother to accomplish her service plan goals. At the conclusion of the termination hearing, before he announced his decision, the trial judge, the Honorable Thomas A. James, stated:

> [W]hat I say quite often is, while parents are trying to get their acts together, the kids are growing up. And they just keep moving on and they can't wait. And this poor kid, he obviously loves you but he also loves his foster parents who he's bonded with.
>
> *     *     *
>
> At this point, as I see your situation, it's a mess and you're going to have to turn [it] around soon unless you take the bull by the horn[s]. In the meanwhile, poor [B.R.] is treading water. He can't tread water, he has to move forward and he has to move forward with people that are giving him guidance and have some stability. For him to be yanked out of a situation he's in now [with foster family] and put into your situation would be a disfavor to him. I think everybody knows that. I think everybody knows that.

N.T. Termination Hearing, 7/8/21, at 105-06.

Finally, as previously noted, Foster Parents, who are an adoptive resource, provide Child with the emotional, physical and social support Child craves. **See In the Interest of N.G.**, 235 A.3d 1274, 1281 (Pa. Super. 2020) (for section 2511(b) purposes, "trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love,

- 10 -

comfort, security, and stability the child might have with the foster parent")
(citation omitted). Under such circumstances, we conclude that the trial court
correctly determined that CYS presented clear and convincing evidence that
termination would serve the needs and welfare of Child under section 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/8/2022